FILED
United States Court of Appeals
Tenth Circuit

November 7, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

AQUILA, INC.,

      Plaintiff-Appellee,

v.

C.W. MINING, d/b/a Co-op Mining
Company,

      Defendant-Appellant.

No. 07-4255

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:05-CV-555-TC)**

Todd W. Ruskamp (Elizabeth C. Burke with him on the brief), Shook, Hardy &
Bacon, L.L.P., Kansas City, MO, for Plaintiff-Appellee.

Carl E. Kingston, Salt Lake City, UT, for Defendant-Appellant.

Before **McCONNELL, EBEL,** and **GORSUCH**, Circuit Judges.

**GORSUCH**, Circuit Judge.

      This diversity action implicates a contract between C.W. Mining ("CWM")

and Aquila, Inc. ("Aquila"), pursuant to which CWM supplied Aquila, a public

utility that produces electrical power, periodic shipments of coal from CWM's

Utah mine. At trial, Aquila claimed that CWM breached the parties' contract by failing to perform as promised and that, as a result, it had to purchase coal from other sources at prices higher than those specified in the contract. CWM conceded its failure to perform, but argued that its nonperformance was excused by virtue of a labor dispute that amounted to a force majeure event under the terms of the contract. The district court disagreed with the factual premise underlying this defense, finding that geological, not labor, problems were the primary force inhibiting CWM's performance. The district court further rejected CWM's alternative theory that the geological difficulties themselves qualified as force majeure events because Aquila had actual notice of them that substituted for the written notice required under the contract; instead, the court found that Aquila never received adequate notice that CWM considered its geological difficulties to constitute force majeure events. Finally, the district court found that Aquila properly mitigated its losses and that it was entitled to approximately $24 million in damages. CWM appeals each of these determinations. Because we agree with the district court's legal conclusions and find no clear error in its factual findings, we affirm.

I

A

On September 16, 2003, the parties signed an agreement obliging CWM to provide Aquila with a total of 1,550,000 tons of coal during the years 2004-2006, with an option for Aquila to extend the contract through 2008.  Pertinent for our purposes, the contract also contained a force majeure provision providing in relevant part as follows:

Section 13   Force Majeure

(A) Defined

The term "Force Majeure" as used herein shall mean any and all causes beyond the reasonable control of the party failing to perform, including but not limited to acts of God; . . . labor disputes; boycotts; lockouts; labor and material shortages; . . . ; breakdowns of or damage to plants, equipment, or facilities; . . . or other causes of a similar nature which wholly or partly prevent or make unreasonably costly (i) the mining, delivering, or loading of the coal by Seller; or (ii) the receiving, transporting, accepting, or utilizing of the coal by Buyer at the Station.  To be considered unreasonable such increased costs must be substantial and sustained so that mining is no longer possible.  This Section shall not be construed to require either party to prevent, settle or otherwise avoid or terminate a strike, work slowdown, or other similar labor action.

(B) Effect Hereunder

If, because of any Force Majeure, either party hereto is unable to fulfill any of its obligations under this Agreement, and if such party shall promptly give to the other party concerned written notice of such Force Majeure, then the obligation of the party giving such notice shall be suspended to the extent made necessary by such Force Majeure and during its continuance, and the obligations of the party receiving the notice shall be equally suspended; provided, however, that the party giving such notice shall use its best efforts to eliminate such Force Majeure insofar as reasonable, with

a minimum of delay. Any deficiencies in deliveries or acceptance of coal hereunder caused by Force Majeure shall not be made up except by mutual consent. If a Force Majeure continues for more than six (6) months then either party may terminate this Agreement by giving written notice to the other party without penalty or cost. During an event of partial Force Majeure by either party, a fair and reasonable allocation of deliveries of coal or the ability to consume coal shall be made to mitigate the impact on each party.

Aplt. App. at 129-30 (Section 13 of the contract).

The contract further included a choice of law clause specifying that Missouri law was to control the parties' agreement, *id.* at 132 (Section 18), as well as a nonwaiver clause indicating that

[t]he failure of either party hereto to insist in any one (1) or more instances upon strict performance of any provision of this Agreement by the other party hereto, or to take advantage of any of its rights hereunder, shall not be construed as a waiver by it of any such provisions, or of the obligation to comply with such provisions in the future and the same shall continue and remain in full force and effect.

*Id.* at 131 (Section 16(A)).

Less than a week after signing the contract, a labor strike hit CWM, and between 50 and 70 of its 120 employees walked off the job. Because CWM believed its collective bargaining agreement with the International Association of United Worker's Union prohibited its employees from striking, the company anticipated that the strike would be quickly resolved. As it happened, however, the labor dispute lingered unresolved for over two years.

Fall of 2003 also represented the beginning of other hardships for CWM. Several roof collapses that season culminated in the Federal Mine Safety and

Health Administration ("MSHA") ordering CWM to seal its mine number one in January 2004. At that time, CWM anticipated it could still meet its contractual obligations to Aquila with coal from its mines three and four, but CWM soon encountered a slew of geological problems in mine three. These included roof collapses, muddy conditions, and "hot spots" of coal (essentially areas of extremely high temperatures). According to CWM's mining supervisor, Mr. Defa, the muddy conditions and the hot coal were the worst of those problems he had seen in thirty-eight years of mining. Supp. App. at 126, 128. Because of the muddy conditions in mine three, according to Mr. Defa active mining in that mine "almost stopped." Supp. App. at 131 (Testimony of Mr. Defa). And as to the "hot spots" of coal, they "slowed the mining way down. It stopped [CWM] from mining that area." *Id.* at 132. When the problems first erupted in mine three, mine four was not yet ready for coal production.

In December 2003, just before CWM's delivery obligations to Aquila were slated to begin, CWM notified Aquila in writing that it considered its labor dispute a force majeure event, as defined by the parties' contract, and that its coal shipments would be reduced as a result. Over the course of the following months, CWM sent several more letters to Aquila confirming the labor dispute's status as a force majeure event, and updating Aquila on the progress of its labor negotiations. For its part, Aquila accepted the coal CWM did deliver, but informed CWM by letter on August 25, 2004, that "[f]or the avoidance of doubt,

Aquila does not, with this letter and the requests contained herein, waive any rights it has or excuse [CWM] from any obligations it has under the Agreement." Supp. App. at 148.

While CWM invoked the force majeure clause with respect to its labor problems, the geological difficulties it experienced were another matter. In March 2004, a coal purchasing agent for Aquila, Phil Rogers, visited CWM's mines and was shown maps of mines three and four, escorted through mine three, and told that mine number one had been closed by order of MSHA. Some months later Mr. Rogers again visited the mines, was escorted through both mines three and four, and was told of the geological problems CWM continued to face. At no point, however, was Mr. Rogers or anyone else at Aquila notified, in writing or otherwise, that CWM considered these geological problems force majeure events. To the contrary, CWM downplayed its geological problems and represented that they would be overcome shortly.[1]

---

[1] *See, e.g.,* Supp. App at 109 (CWM's president testifying that after showing Mr. Rogers some of the geological problems he "didn't seem too concerned because we did show him the reserves we had in the number three mine that we were developing toward"); *Id.* at 111 ("We [CWM] mentioned to them [Aquila] that with that hot coal that we had encountered, there was going to be some delay until we could mine around it and find a way around it and determine just how much it was going to affect the reserves. And then – but we did mention to them that we were getting ready to start the full production in the number four mine, and that was going to give us another section that would help that production.")

In April 2005, CWM informed Aquila of its intent to cancel the contract entirely, citing the parties' force majeure provision. Until CWM cancelled the contract, Aquila accepted CWM's partial deliveries of coal and bought the remainder of its required coal on the spot market. Once CWM cancelled the contract, Aquila entered into a new long-term contract with Consolidated Coal Company ("Consolidated") on terms less favorable to Aquila than those contained in the CWM contract. In particular, the price of coal Aquila had to pay was higher, and the coal it received had a higher sulfur content, necessitating the purchase of sulfur emission credits before the coal could be burned.

B

In due course, Aquila brought suit against CWM in the United States District Court of Utah to recoup the damages it sustained as a result of CWM's impaired performance under – and eventual cancellation of – the contract. As its chief defense, CWM asserted that its labor dispute and geological problems, of which it argued Aquila had written notice of the former and actual notice of the latter, excused its deficient performance under the contract as force majeure events. CWM also asked the court to find that Aquila had waived its claim that CWM breached the contract by continuing to accept coal shipments from CWM, and that, if nothing else, Aquila had failed to mitigate its damages.

After a three-day bench trial, the district court rejected each of CWM's defenses and awarded over $24 million in damages to Aquila. In doing so, the

court found (1) CWM failed to prove that its performance was excused by virtue of a force majeure labor dispute; (2) CWM did not inform Aquila in writing that it considered geological problems to be force majeure events, and neither did Aquila have actual notice to that effect; (3) CWM did not prove Aquila had waived its right to sue for breach of contract; and (4) CWM did not prove that Aquila failed to mitigate its damages. CWM timely appealed these holdings, and we review each in turn.

II

In aid of its first argument – that the district court "erred in concluding that the labor dispute at CWM was not a force majeure that excused performance," Aplt. Br. at 20 – CWM appears to offer two distinct theories. First, it asserts that the district court's decision rests on a factual error; then, and alternatively, it assigns legal error to the court's conclusion.

A

As a factual matter, CWM contends that its labor dispute caused *all* of its coal production problems and, thus, as a force majeure event of which Aquila had written notice, the labor dispute excused *all* of its deficient performance under the contract. In CWM's view, the geological problems it suffered affected coal production only because the company lacked sufficient workers to overcome them; its geological troubles were thus merely symptoms of the labor dispute, not an independent malady. As CWM puts it, "[h]ad CWM not lost its labor force, it

would have been able to overcome the geological problems and would have fully performed under the contract, despite the problems." Aplt. Br. at 23-24.

Reviewing the district court's factual finding that CWM's geological problems were the primary cause of its production difficulties and arose independently from its labor dispute, we may reverse only in the presence of clear error – that is, only if the court's finding "is without factual support in the record or if, after reviewing all the evidence, we are left with a definite and firm conviction that a mistake has been made." *Keys Youth Servs., Inc. v. City of Olathe*, 248 F.3d 1267, 1274 (10th Cir. 2001) (quotation marks omitted). After a careful review of the record, we have no such conviction.

Copious evidence supports the district court's finding that CWM's geological problems were the primary cause of its inability to perform as promised in the parties' contract. Indeed, testimony from CWM's own top-level employees supports the district court's factual finding on this score. *See, e.g.*, Supp. App. at 132 (Mr. Defa, CWM's mining supervisor, testified that the hot spots CWM encountered "slowed the mining down. It stopped us from mining that area [of mine three]."); *id.* at 131 (Mr. Defa testified that due to the muddy conditions in mine three mining there "almost stopped."); *id.* at 112 (CWM's president, Mr. Reynolds, testified that "in March of 2005, as we were developing [mine three], we again encountered the burn area, only in this area the temperatures were gone ahead of us but so was the coal. *It had already been*

- 9 -

*burned, and there was no coal there*."); *id.* at 113 (Mr. Reynolds testified that "we knew we were not going to fill . . . the production levels because of that burnout and because of the hot zone there, that the reserves we thought we had were not there.").

The question remains whether its geological problems arose independently, as the district court found, or whether they affected production only because CWM lacked sufficient personnel to address them, as CWM contends. The record before us reveals that CWM prepared a list of job openings on April 1, 2004, showing only three openings on that date. Supp. App. 184-86 (CWM's list); *see also* Dist. Ct. Op. at 5. This fact – that CWM professed to need only three additional workers at a time when it was suffering mightily from its geological difficulties – tends to undercut its position. If CWM's geological difficulties could be cured simply by additional employees, why seek only three more employees? Making matters worse, CWM's own president testified that "the reason for the list being short at that time was we had encountered that hot spot in the one section, and we were working on the rock tunnel in the other section, *and we had no other areas to put the employees to work at that time*." Dist. Ct. Op. at 5 (quoting testimony from Mr. Reynolds). Given such evidence, we cannot help but conclude that the district court's factual finding that geological, not labor, problems formed not just the primary but also an independent cause of CWM's

difficulties is entirely plausible, if not inescapable.  Accordingly, we see no reversible clear error.

B

Even accepting the district court's factual finding that geological problems were the primary and independent cause of its production difficulties, CWM contends that the district court's decision nonetheless rests on a legal error. CWM suggests that its labor dispute – which indisputably inhibited its performance to *some* degree and was a declared force majeure event – excused the entirety of its deficient performance.  That is, even if the labor dispute was not solely or even primarily responsible for its deficient performance, CWM contends that it remains, under the parties' contract, a force majeure event sufficient to excuse CWM from its failure to perform.  We of course review assignments of legal error, including allegations of contractual misconstruction, *de novo*.  *See Holdeman v. Devine*, 474 F.3d 770, 775 (10th Cir. 2007).

Even under that standard, however, we ultimately find CWM's argument unavailing.  To be sure, we agree with the initial premise of CWM's argument: the plain language of the parties' agreement defines a force majeure as including difficulties that prevent performance "wholly *or partly*."  A force majeure event thus need not be something that precludes a party from performing at all.  At the same time, we cannot accept CWM's subsequent assertion that a partial force majeure could excuse it from performance difficulties arising from what the

- 11 -

district court fairly found to be other, entirely independent causes. The parties'

agreement expressly indicates that a party's obligations will be suspended by the

force majeure, but only to "*the extent made necessary* by such Force Majeure," at

least until such time as the contract is properly terminated. That is, under the

terms of the agreement, the district court could lawfully excuse CWM's deficient

performance during the life of the contract only *to the extent* that the partial force

majeure – here, the labor dispute – caused the deficiency.

Under this contractual scheme, CWM was free to prove at trial the extent to

which the labor dispute force majeure, as opposed to independent geological

problems, caused its nonperformance, and to be excused from damages caused by

the labor dispute. Under Missouri law, much as elsewhere, however, it was

CWM's burden to come forward with proof from which the district court could

determine the impact of the force majeure labor strike. *See ASi Indus. GmbH v.

MEMC Elec. Materials, Inc.*, 2008 WL 413819, at * 4 (E.D. Mo. 2008) (invoking

force majeure in response to a claim of breach is affirmative defense); *Gennari v.

Prudential Ins. Co. of Am.*, 335 S.W.2d 55, 60 (Mo. 1960) ("The burden o[f]

proof on all affirmative defenses rests upon the defendant as the asserting

party."). The difficulty in this case is that CWM declined to offer the district

court any evidentiary basis from which the court could have assessed what part of

Aquila's losses were attributable to labor problems versus geological problems.

Perhaps a reflection of the persistent optimism of miners throughout the history of

the American West,[2] CWM instead adopted an "all or nothing" trial strategy, asserting that *all* of its nonperformance should be excused under its labor-shortage-as-source-of-all-problems theory. *See, e.g.*, Aplt. Br. at 23-24, 28. In doing so, CWM declined to offer a back-up theory, tailored to the possibility that the court might find that geological problems posed an independent obstacle to CWM's performance, that identified which *part* of its nonperformance might be fairly attributable solely to its labor difficulties.

The district court recognized CWM's tactical decision and noted that, without some evidence about the extent to which labor problems caused CWM's failure to perform, it was simply unable to reduce Aquila's damages without resorting to (impermissible) speculation: "[a]lthough the labor problems *had some impact* on CWM's coal production, *how much impact is not clear*." Dist. Ct. at 10 (emphasis added). Far from erroneously interpreting the contract, therefore, the district court's opinion reflects a correct interpretation and an evidentiary deficiency of CWM's making. Of course, parties routinely, and for many good tactical reasons, decline to pursue back-up defense theories that involve undesirable concessions to an opponent's theory of the case. But these are tactical decisions that must be abided when they fail, not just admired when they succeed. CWM thus cannot be heard to complain about an evidentiary gap it

---

[2] *See, e.g.*, Frederick Jackson Turner, *The Frontier in American History* (2007 ed.); George F. Willison, *Here They Dug the Gold* (1950 ed.).

had the opportunity, and bore the responsibility, to fill. *See Grand River Enter.*

*Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 68 (2d Cir. 2007) ("To the extent that

there was a dearth of evidence, [the party bearing the burden of proof] is to

blame. Consequently, [that party] should not now be allowed to complain that the

district court relied on the limited evidence that *was* provided."); *Sure-Trip, Inc.*

*v. Westinghouse Eng'g*, 47 F.3d 526, 533 (2d Cir. 1995); *Filippini v. United*

*States*, 318 F.2d 841, 845 (9th Cir. 1963).[3]

---

[3] Our analysis of the preceding questions invites another – namely, whether *any* event that qualified as a force majeure by "partly prevent[ing]" performance and that continued for the contractually specified period of six months could entitle a party to *cancel* the contract. The implications of such an argument naturally give reason for pause. What if CWM's coal production fell by 0.0000001% due to, say, an equipment breakdown, but CWM could still fulfill 99.9999999% of its coal shipments to Aquila? It seems unlikely the parties would have intended to allow CWM to cancel *all* of its obligations to Aquila under these circumstances. If this were true, each party could cancel the contract virtually whenever it pleased and such a contract would provide little stability to the parties, all but negating any reason a party might want to enter into a long-term sales contract in the first place. At the same time, and despite what we surmise might have been the parties' intentions, the plain language of the contract suggests that a force majeure that "partly prevents" performance may permit termination. Happily, however, we do not need to venture any further into this thicket. While this contractual interpretation question arose during the course of oral argument, and it may be one parties wish to give attention when drafting force majeure clauses in the future, CWM did not fairly raise it in its brief before us or at any time before the district court. Without any indication from CWM that the issue would be at play, Aquila did not address it in its briefing either. In these circumstances, we decline to address the question. It is not our role to play the part of counsel by making an argument for a party as well-represented as CWM that it has not chosen to make for itself. *See Am. Airlines v. Christensen*, 967 F.2d 410, 415 n.8 (10th Cir. 1992); *cf. Headrick v. Rockwell Int'l Corp.*, 24 F.3d 1272, 1277-78 (10th Cir. 1994).

III

Even assuming the district court correctly found that its problems arose primarily and independently from geological difficulties, CWM submits that reversal is still required. Though the contract required the parties to provide written notice of any force majeure in order to avoid damages for nonperformance, CWM submits that Aquila had actual notice of its geological difficulties. And, CWM contends, under Missouri law, and most particularly *Gateway Frontier Properties, Inc. v. Selner, Glaser, Komen, Berger & Galganski, P.C.*, 974 S.W.2d 566 (Mo. Ct. App. 1998), actual notice can substitute for written notice required by contract so long as the receiving party is not prejudiced by the substituted form of notice, *see* Aplt. Br. at 32-37.

It is unclear whether Missouri law goes quite as far as CWM suggests. In *Blue Ridge Bank & Trust Co. v. Trosen*, 221 S.W.3d 451, 458-460 (Mo. Ct. App. 2007), the Missouri Court of Appeals recently questioned whether actual notice can substitute for written notice, at least in the context of private party contracts. *Id.* at 460. The *Blue Ridge* court noted that *Gateway* relied entirely on cases pertaining to *statutory* notice, and then proceeded to hold that cases involving private party contracts – like that between Aquila and CWM – are different in kind from statutory notice cases. *Id.* It did so reasoning that in the arena of private contracts, the "cardinal rule . . . is that the parties' intentions must be ascertained and given effect . . . . Unless the contractual provisions are

- 15 -

ambiguous, the contract language alone is used to determine the parties' intent." *Id.* at 459. When private parties clearly intend to require written notice, the *Blue Ridge* court explained, that intention should be respected. *See id.*[4]

Even accepting for argument's sake CWM's contention that Missouri does not enforce contract provisions requiring written notice of a force majeure when actual notice of a force majeure exists, these circumstances simply do not pertain here. To be sure, Aquila had notice that CWM was experiencing geological problems. But, the district court expressly found that Aquila did *not* have actual notice that CWM considered its geological problems a force majeure event. Dist. Ct. at 31. CWM points us to no piece of evidence in the record to suggest this finding was in clear error, and neither could it do so: CWM repeatedly downplayed the significance of its geological problems, promising Aquila that they would be resolved quickly. *See supra* n.1. On this basis alone, CWM's argument before us must fail.

---

[4] The remaining cases on which CWM seeks to rely, *Reichert v. Jerry Reece, Inc.*, 504 S.W.2d 182 (Mo. Ct. App. 1973); *Gannon Int'l, Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 2006 WL 288096 (E.D. Mo. 2006), suffer from similar problems. *Reichert* involved a statutory notice provision. Worse still, the statutory notice provision at issue there explicitly stated that "[n]o defect or inaccuracy in the notice shall invalidate it unless the commission finds that the employer was in fact misled and prejudiced thereby." *Reichert*, 504 S.W.2d at 188 n.5. The Aquila-CWM contract of course provides no such exception. *Gannon*, meanwhile, held that failure to provide timely notice of a loss did not necessarily void insurance coverage. *Gannon*, 2006 WL 288096, at *2. The court did not consider the question of actual versus written notice and rendered its ruling on a doctrine developed specially in the context of insurance contracts.

Neither could we accept CWM's apparent belief that the difference between notice of an event and notice that a party considers that event to be a force majeure is inconsequential or, in *Gateway*'s terminology, non-prejudicial. After all, classifying an event as a force majeure has powerful ramifications – at the very least, receiving notice that an event is considered a force majeure allows a party to evaluate the validity of a claimed force majeure event and permits it to make other arrangements to mitigate its damages if it suspects the event is serious and will persist. CWM's notice was not calculated to meet these objectives. Far from alerting Aquila that its geological problems might rise to the level of a force majeure, a "cause[] beyond the reasonable control of the party failing to perform," Aplt. App. at 129 (Section 13(A) of the contract), CWM strung Aquila along with assurances that its geological problems would be easily and quickly surmountable. Simply put, notice that a party to a contract has some soon-to-be rectified problem is materially and consequentially different from notice that a party has a serious and potentially enduring problem qualifying as a force majeure event.

IV

Whatever the success of its other liability arguments, CWM argues that Aquila waived its claim for breach of contract because Aquila "continued to accept deliveries of coal less in quantity and lower in quality than the contract required for a year and a half [after notice of the labor dispute as force majeure]

- 17 -

and never declared a breach." Aplt. Br. at 30. As CWM sees it, Aquila's acceptance of defective performance amounted to a waiver of Aquila's right to sue for breach; in CWM's view, the proper course, and only means Aquila had to preserve its right to sue, was to "demand[] full performance or declare[] a breach and commence[] litigation within a reasonable time." *Id.*[5]

We approach the question of waiver cognizant that, under Missouri law, "[w]aiver is a question of intention, and is based upon knowledge of the circumstances." *Purington Paving Brick Co. v. Metro. Paving Co.*, 4 F.2d 676, 680 (8th Cir. 1925). It is "an intentional relinquishment of a known right. To rise to the level of waiver, the conduct must be so manifestly consistent with and indicative of an intention to renounce a particular right or benefit that no other reasonable explanation of the conduct is possible." *Austin v. Pickett*, 87 S.W.3d 343, 348 (Mo. Ct. App. 2002) (citations omitted). The dispositive question before us, then, is whether Aquila *intended* to renounce its right to sue.

We think the answer to this question is clearly no, and we are influenced by three facts in reaching this conclusion. First, the parties included a non-waiver clause in their contract expressly stating that the failure of one party to insist upon strict performance from the other ought not be construed as a waiver. Aplt.

---

[5] CWM also argues that Aquila waived its right to object to CWM's notice of force majeure and to receive written notice of the geological problems. *See* Aplt. Br. at 29. Because CWM raises these arguments for the first time on appeal, *see* Supp. App. at 12, 40-41, and in deference to our general rule, *see* *Headrick*, 24 F.3d at 1277-78, we decline to consider them.

App. at 131 (Section 16(A)). Second, rather than represent a waiver of a right to full performance, Aquila's acceptance of partial performance was contemplated and perhaps even required by the parties' force majeure clause. Under the terms of the parties' force majeure provision, Aquila's obligation to accept coal was suspended only to the extent that CWM's obligation to supply coal was suspended by the force majeure, *id.* at 130 (Section 13(B)); had Aquila declined to accept CWM's deficient shipments of coal, it may well have faced a suit for its own breach of contract. Third, to avoid any possible later confusion, Aquila wrote CWM a letter specifically stating that, "[f]or the avoidance of any doubt, Aquila does not, with this letter and the requests contained herein, waive any rights it has or excuse [CWM] Mining from any obligations it has under the Agreement, including, but not limited to, [CWM] Mining's obligation to deliver coal to Aquila in the quantity and quality provided for under the Agreement." Supp. App. at 148. CWM makes no effort to explain why the confluence of this letter and the explicit language in the contract contemplating and perhaps even requiring – but never penalizing – Aquila's acceptance of partial coal shipments fails to resolve the waiver question definitively in Aquila's favor.

V

Finally, CWM contends that Aquila failed to mitigate its damages by failing to negotiate its April 2005 contract with Consolidated on better terms.[6] For example, CWM argues that market data revealed the spot price of coal in April 2005 to be $28 per ton, *see* Aplt. Br. at 41, while the Aquila-Consolidated contract provided for a price of $38.06 per ton, Supp. App. at 161.

We have difficulty evaluating CWM's argument, however, because CWM provides no citation in the voluminous record before us to support its claim about the price of coal in April 2005. When a party's brief fails to provide citations in support of its factual assertions, we are left to scan volumes aimlessly for asserted facts. But reading a record should not be like a game of Where's Waldo? *See* Martin Handford, *Where's Waldo?: The Great Picture Hunt* (2006). And it is

---

[6] CWM also argues before us that Aquila acted unreasonably in failing to enter into a long-term contract prior to April 2005, the date when CWM cancelled the contract. This argument was not raised at trial before the district court, however, *see* Dist. Ct. Op. at 12, and therefore cannot be pursued here. Even were we to consider it, though, we would find it unpersuasive given CWM's assurances to Aquila, throughout the duration of the contract, that the labor dispute would soon be terminated and coal production would return to normal. *See, e.g.*, Aplt. App. at 160 (CWM letter of December 2003 to Aquila describing its labor problems and stating that "it appears it may be 60 to 90 more days before we are back to our normal production"); Aplt. App. at 168 (CWM letter of April 2004 to Aquila stating that it felt its "labor situation" would "be resolved in the not too distant future" and that it "hope[s] to be back to [its] normal production before long"); Aplt. App. at 169 (CWM letter of September 2004 to Aquila stating that its attorneys expect a decision within a month from the NLRB and that it "hope[s] that this will settle the matter and we can begin to get our labor force back to normal"). In essence, CWM's argument boils down to asserting that Aquila acted unreasonably by listening to CWM's own representations.

- 20 -

within our power as a court to refuse to consider an argument in these circumstances. *See MacArthur v. San Juan County*, 495 F.3d 1157, 1161 (10th Cir. 2007) ("It is indisputably within our power as a court to dismiss an appeal when the appellant has failed to abide by the rules of appellate procedure."); Fed. R. App. P. 28 (a)(9)(A) (appellant's argument must contain "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which appellant relies").

Even bypassing this defect and reaching the merits of CWM's argument, however, there is plainly "factual support in the record" to support the district court's finding that Aquila reasonably mitigated its damages. *Keys Youth Servs.,* 248 F.3d at 1274. Not only was there evidence that the price of coal in the Consolidated contract was well within the range of market prices at the time, *see* Supp. App. at 143-44, but Abby Herl, Aquila's director of coal procurement, testified that, for a variety of reasons, the Consolidated contract was the "best selection" among the options available to Aquila at the time, *see* Supp. App. at 79. The district court explicitly credited and relied on Ms. Herl's testimony to conclude Aquila properly considered its options and took an appropriate course under the circumstances. Dist. Ct. Op. at 12-13. The Supreme Court has cautioned that "when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding,

if not internally inconsistent, can virtually never be clear error." *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985).  Finding Ms. Herl's testimony "coherent and facially plausible" and not "contradicted by extrinsic evidence," we are in no position to disturb the district court's factual finding.

* * *

The judgment of the district court is

*Affirmed.*