**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 22, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

BEVERLY GORNY,

      Plaintiff-Appellant,

v.

KEN SALAZAR, Secretary of the
United States Department of Interior,

      Defendant-Appellee.

No. 10-8047
(D.C. No. 2:09-CV-00113-ABJ)
(D. Wyo.)

**ORDER AND JUDGMENT**[*]

Before **TYMKOVICH**, **McKAY**, and **GORSUCH**, Circuit Judges.

Beverly Gorny, an employee of the Bureau of Land Management, brought
this lawsuit alleging that BLM unlawfully retaliated against her for filing multiple
Equal Employment Opportunity ("EEO") complaints. In the end, however, the
district court granted BLM's request for summary judgment. We now affirm that
judgment because, as the district court correctly observed, Ms. Gorny has failed
to rebut the many lawful reasons BLM offered for its conduct.

---

[*] This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

I

The facts giving rise to this case are well-familiar to the parties and extensively recounted in the district court's opinion, so we offer only a brief sketch of them here.

For some time, Ms. Gorny worked as a public affairs specialist in the Office of External Affairs ("OEA"), a division of the Wyoming State Office of BLM. The troubles giving rise to this case began after she agreed to settle an EEO complaint against her then-supervisor Susanne Moore and Associate State Director Alan Kesterke. Soon afterward, Ms. Moore decided to leave her position as OEA chief of the Wyoming State Office, and when she did Ms. Gorny and others alternated as acting chief while BLM searched for a replacement. At the same time, Ms. Gorny applied to fill the chief position permanently. BLM eventually narrowed the pool of candidates to six individuals, including Ms. Gorny and Steven Hall. After two BLM officials interviewed and ranked the candidates, Mr. Hall won the job. In reply, Ms. Gorny filed a second EEO complaint, alleging that she had not been selected in retaliation for her earlier EEO complaint.

According to Ms. Gorny, BLM's retaliation intensified after Mr. Hall's arrival. Early in his tenure, Mr. Hall became concerned about what he perceived to be the overuse of flexible work schedules at OEA. At that time, OEA had only two full time employees, Ms. Gorny and Cindy Wertz, as well as an intern,

Ashley Colgan. Both Ms. Gorny and Ms. Wertz had flexible schedules. Ms. Gorny took every other Friday off and Ms. Wertz was permitted to adjust her work days as she saw fit. After discussions with OEA staff and others, Mr. Hall implemented a new policy requiring both Ms. Gorny and Ms. Wertz to work a standard schedule. Unhappy with this change, Ms. Gorny again threatened legal action, and from this point forward the relationship between Mr. Hall and Ms. Gorny became increasingly strained. On a number of occasions, Mr. Hall expressed dissatisfaction with Ms. Gorny's work product and her failure to meet deadlines; Ms. Gorny was formally reprimanded when, in response to one such conversation, she asked Mr. Hall if he expected her to "just bend over and take it." Aplt. App. at 520-21. These disagreements also led Ms. Gorny to file a third EEO complaint, which included more allegations of retaliation.

Ms. Gorny's troubles with Mr. Hall came to a head when, following still another confrontation about the quality of her work, she says she suffered a nervous breakdown. At that point, she sought and was granted leave to recover from anxiety and depression. During her absence, Mr. Hall contacted her on occasion to request documentation of her medical condition and to ask when she planned to return. When Ms. Gorny finally returned to work almost a year later, it was only for a short period while Mr. Hall was out of the office on a detail; when Mr. Hall returned to the office, Ms. Gorny again took leave. A few weeks later, Mr. Hall proposed firing Ms. Gorny due to "non-availability." In response,

Ms. Gorny returned to the office but asked to work only half days. Unwilling to accept this part-time arrangement, Mr. Hall informed Ms. Gorny that she needed to work eight hours a day five days a week or she would be considered absent without leave. When Ms. Gorny still chose to work only a half day, BLM terminated her employment. Ms. Gorny replied by filing a fourth administrative complaint alleging retaliation, though this time with the Merit Systems Protection Board.

When BLM advertised the vacancy created by Ms. Gorny's departure, she promptly applied for her old job. She was soon told, however, that the posting had been withdrawn because a reorganization of OEA had resulted in the elimination of her old position. Even so, Ms. Gorny ultimately succeeded in appealing her dismissal through various administrative processes and BLM was forced to reinstate Ms. Gorny as a public affairs specialist in the Division of Lands and Minerals. Soon thereafter, Ms. Gorny filed a fifth EEO complaint.

Several months later, this lawsuit followed. In it, Ms. Gorny alleged, among other things, that BLM repeatedly retaliated against her for filing her various EEO complaints. Separately, she also argued that BLM's retaliatory actions, in the aggregate, created a hostile work environment. For its part, BLM disputed all this and moved for summary judgment. Ultimately, the district court granted BLM's motion, and it is this judgment Ms. Gorny now appeals.

## II

Title VII of the Civil Rights Act forbids retaliation against an employee who voices opposition to, or participates in, an investigation or proceeding alleging an unlawful employment practice by his or her federal employer. *See* 42 U.S.C. § 2000e-16; *Dossa v. Wynne*, 529 F.3d 911, 915-16 (10th Cir. 2008) (holding that § 2000e-3(a)'s general ban on retaliation by private employers applies also to federal employers through § 2000e-16(c)). In what follows, we analyze Ms. Gorny's various Title VII retaliation arguments in sequence. Part A focuses on Ms. Gorny's claim that she has a triable retaliation claim in light of direct evidence. *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985). In Part B, meanwhile, we examine Ms. Gorny's circumstantial evidence of discrete retaliatory actions, using the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Finally, in Part C we focus on Ms. Gorny's additional claim that those discrete actions, in the aggregate, created a retaliatory hostile work environment. As always, we review the district court's grant of summary judgment on these questions *de novo*, and in doing so we view the facts, and all reasonable inferences those facts support, in the light most favorable to Ms. Gorny, as the non-movant.

### A

Seeking to suggest that direct evidence of retaliation exists in this case, Ms. Gorny refers us to certain comments allegedly made by Mr. Kesterke and Mr.

Hall. But direct evidence of retaliation is evidence, which if credited, does not require any inference or presumption to establish that unlawful retaliation motivated an employer's action. *See Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117 (10th Cir. 2007); *Spengler v. Worthington Cyclinders*, 615 F.3d 481, 491 (6th Cir. 2010). And none of Ms. Gorny's proffered statements fits this bill. We offer three examples illustrating our conclusion on this score.

*First*, Ms. Gorny refers us to a statement Mr. Kesterke made in which he admitted that he did not trust her. This comment, Ms. Gorny stresses, came after she had filed an EEO complaint. For this reason, she says the statement proves that Mr. Kesterke harbored an unlawful retaliatory animus against her. But not only does Mr. Kesterke's statement have little apparent connection to any particular allegedly retaliatory action, even more importantly it doesn't — directly, at least — suggest any unlawful animus. Mr. Kesterke may have distrusted Ms. Gorny for any number of perfectly benign (for Title VII purposes) reasons; his statement does not establish, directly, that he wished to retaliate against her because of her EEO activity. To arrive at *that* conclusion, some additional inference is required. And the necessity of such an inference means the comment isn't *direct* evidence of a retaliatory animus for purposes of Title VII. *See Hall v. U.S. Dep't of Labor Admin. Review Bd.*, 476 F.3d 847, 855 (10th Cir. 2007).

*Second*, Ms. Gorny refers us to a conversation between Mr. Hall and Ashley Colgan. The conversation took place after Mr. Hall learned that Ms. Colgan had been interviewed in connection with Ms. Gorny's pending EEO case. Ms. Gorny submits that Mr. Hall told Ms. Colgan that, "when this is all over, Beverly Gorny is going to be gone." Aplt. App. at 231. In Ms. Gorny's view, "this" plainly referred to her pending EEO case and so directly shows Mr. Hall's desire to terminate her on account of her EEO activity. But even assuming that Ms. Gorny is correct — even assuming "this" did refer to her EEO case — the remainder of Mr. Hall's comment is ambiguous. Mr. Hall had many (lawful) reasons for wanting Ms. Gorny gone, including Ms. Gorny's failure to complete projects in a timely manner. Mr. Hall's comment to Ms. Colgan doesn't *directly* indicate that he wished Ms. Gorny "gone" because she filed EEO complaints rather than because she failed to perform her work adequately. To be sure, the comment does suggest that Mr. Hall intended to delay any firing until Ms. Gorny's pending EEO case was resolved. But an employer might well wish to delay even a lawful firing until after an administrative EEO complaint is resolved — and do so specifically to *avoid* any appearance, however mistaken, of unlawful retaliation for the employee's decision to file a complaint. While Ms. Gorny would have this court draw a very different inference than this, our precedent, again, "makes clear that evidence is not 'direct' [evidence of discrimination] if an inference of discrimination is required." *Riggs*, 497 F.3d at 1118.

*Third*, Ms. Gorny points to another episode between Mr. Hall and Ms. Colgan in which Mr. Hall said he needed to implement a standard work schedule for all employees in OEA so that it did not "look like he was singling out" Ms. Gorny in eliminating flexible schedules. Aplt. App. at 111; *see* Opening Br. at 12. As Ms. Gorny sees it, this comment proves, directly, that Mr. Hall intended to retaliate against her based on her earlier EEO activity. Again, we cannot agree. One could interpret Mr. Hall's statement as expressing the legitimate concern that no single employee should feel targeted by a scheduling change. And one can just as easily interpret the comment as evidence that Mr. Hall, if perhaps grudgingly, sought *to comply* with anti-discrimination laws by seeking to avoid any policy that singled out Ms. Gorny. In order to construe Mr. Hall's statement as Ms. Gorny asks us, an additional inference is again required and the necessity of such an inference again confirms that this evidence is not direct.[1]

---

[1] Perhaps recognizing this fact, Ms. Gorny's lawyer claimed for the first time at oral argument that Ms. Gorny was entitled to present her retaliation claim to a jury under a mixed-motive theory. *See Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1225-26 (10th Cir. 2008) (explaining a mixed motive theory); *Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 552 (10th Cir. 1999) (same). The problem is Ms. Gorny never mentioned she was proceeding under such a theory in either of her briefs on appeal; in fact, the words "mixed motive" are entirely absent. And as we have repeatedly said, an issue injected in the litigation for the first time at oral argument "comes too late" to compel this court's consideration of it. *Thomas v. Denny's, Inc.*, 111 F.3d 1506, 1510 n.5 (10th Cir. 1997); *Mondragon v. Thompson*, 519 F.3d 1078, 1081 n.2 (10th Cir. 2008).

B

Even if she lacks direct evidence of retaliation, Ms. Gorny submits she should be permitted to proceed to trial in light of the circumstantial evidence of retaliation she has amassed. Under *McDonnell Douglas*'s burden-shifting framework, we analyze Title VII claims based on circumstantial evidence in three steps. First, a plaintiff opposing summary judgment must make a prima facie case of discrimination. *Young v. Dillon Co.*, 468 F.3d 1243, 1249 (10th Cir. 2006). Second, the defendant then must articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* Third, should the defendant satisfy its obligation on this score, the burden shifts back to the plaintiff who must prove by a preponderance of the evidence that the employer's reasons are a pretext for unlawful discrimination. *Id.*

The first two steps are easily disposed of. We assume without deciding that Ms. Gorny has met her prima facie burden. And we readily conclude that BLM has met its "exceedingly light" burden of establishing a legitimate, non-discriminatory reason for each of the allegedly adverse employment actions Ms. Gorny asserts. *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1173 (10th Cir. 2007) (internal quotation omitted).

On this latter score, and by way of example only, BLM has offered legitimate reasons for its decision to hire Mr. Hall as Chief of OEA rather than Ms. Gorny. It has done so by introducing the deposition testimony of Celia

- 9 -

Boddington and Bob Bennett, both of whom interviewed the six finalists for the chief position. Both stated that they ranked Mr. Hall as their preferred candidate over Ms. Gorny, and Ms. Boddington added that Mr. Hall's interview was "one of the best" she'd heard in a number of years. Aple. App. at 205. According to Mr. Bennett, he was looking for a chief who would be "proactive," Aplt. App. at 41, and he "perceived" this in Mr. Hall when he chose to "talk about . . . strategic things" during his interview, including the current image of BLM and his ideas on how to improve it, Aplt. App. at 132. Mr. Bennett also believed that Mr. Hall had a "wider variety" of experience than Ms. Gorny, whose work at BLM was "for the most part . . . all in one location," the Wyoming State Office. Aplt. App. at 133-34. Although Ms. Gorny complains about the subjective nature of Mr. Bennett's comments, subjective evaluations of a job candidate are often unavoidable — and even critical — in hiring decisions. For this reason, we have said (and reaffirm here) that such subjective reasons can constitute legitimate, non-discriminatory reasons for a challenged hiring decision. *See Birge v. Apfel*, No. 97-2158, 1998 WL 165118, at *3 (10th Cir. Apr. 2, 1998) (unpublished) ("[T]he mere fact that subjective criteria are involved in the reason articulated by an employer does not mean it cannot be accorded sufficient rebuttal weight to dispel the inference of discrimination raised by the prima facie case."); *Harris v. Sweetwater Cnty Sch. Dist. No. 2*, No. 96-8078, 1997 WL 292124, at *2 (10th Cir. June 3, 1997) (unpublished) (same).

Similarly, BLM introduced evidence that Mr. Hall's decision to eliminate flexible work schedules at OEA was designed to increase efficiency, not to retaliate against Ms. Gorny. Mr. Hall stated in his sworn testimony that Ms. Gorny's absence every other Friday was "not feasible" given that OEA was only a three-person office. Aple. App. at 137. There is also record evidence that the only other full time employee in OEA, Ms. Wertz, asked for a scheduling change because she was tired of covering the office on her own every other Friday.

The government also submitted ample evidence in the district court suggesting that Ms. Gorny was ultimately discharged due to her unavailability, not her EEO activity. Indeed, Ms. Gorny readily admits that when she returned to OEA after almost a year of absence on sick leave, she informed Mr. Hall she could work only four hours a day for an undetermined time period. As OEA was a very small office, Mr. Hall deemed this arrangement unworkable, and Ms. Gorny was terminated due to her schedule limitations. Likewise, BLM justified Ms. Gorny's non-selection as Chief of OEA following Mr. Hall's departure by producing evidence that Ms. Gorny lacked the requisite qualifications to be eligible for the position, and Ms. Gorny herself does not now dispute this fact.

Given that BLM has met its burden under *McDonnell Douglas*'s second step, the real dispute in this case, as in many Title VII suits, hinges on the third step and the question of pretext. To reach trial, Ms. Gorny must show that BLM's proffered justifications for its actions are "so incoherent, weak, inconsistent, or

- 11 -

contradictory that a rational factfinder could conclude [they are] unworthy of belief," and thus really constitute pretext for discrimination. *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1197 (10th Cir. 2008) (quoting *Young*, 468 F.3d at 1250). Attempting to do just that, Ms. Gorny points to several pieces of evidence, the three most significant of which we discuss here.

*First*, Ms. Gorny attacks BLM's explanation for selecting Mr. Hall as OEA Chief, arguing that she was more qualified for the job. Our authority to hold for Ms. Gorny on this basis is limited, however. As we've said, our role isn't to "act as a super personnel department that second guesses employers' business judgments," *Jaramillo v. Colorado Judicial Dept.*, 427 F.3d 1303, 1308 (10th Cir. 2005) (internal quotation omitted), but to serve as a vital means for redressing discriminatory decisions. For this reason, "minor differences between a plaintiff's qualifications and those of a successful applicant are not sufficient to show pretext"; rather, a plaintiff must come forward with facts showing an "overwhelming" disparity in qualifications. *Id.* (internal quotation omitted).

Applying this standard, we agree with the district court that any difference between Ms. Gorny's and Mr. Hall's qualifications does not come close to suggesting pretext. We do not doubt that Ms. Gorny worked at BLM for longer than Mr. Hall. Neither do we question that Ms. Gorny had greater experience as a public affairs specialist. But, as the district court noted, Mr. Hall also enjoyed extensive and diverse qualifications. He had public affairs experience with both

BLM and the State of Colorado, and prior to that he had served for over two years as an adjunct professor of journalism. As Mr. Bennett noted, Mr. Hall also had more experience with the field offices of BLM than Ms. Gorny, who had served primarily in the state offices — a legitimate consideration given that the OEA Chief works with the field offices. In fact, Ms. Gorny herself admits "it's helpful for state office personnel to experience working in field offices." Aple. App. at 70. Unlike Ms. Gorny, Mr. Hall also had experience working as a newspaper journalist for more than two years, a qualification relevant to OEA which has "routine contact with the media." Aple. App. at 137. And Mr. Hall had a master's degree in journalism while Ms. Gorny possessed a bachelor's degree. Given all this, we cannot help but conclude that BLM could have believed in good faith that Mr. Hall was at least as well qualified as Ms. Gorny, and perhaps even more so.[2]

---

[2] Ms. Gorny replies that Mr. Bennett's observations of her during the final interview were "tainted" by the fact that he knew of her prior EEO complaints. Opening Br. at 54. But Ms. Gorny has not pointed us to any evidence suggesting that Mr. Bennett's evaluation of her candidacy was in any way affected by her earlier EEO complaints. To the contrary, Mr. Bennett testified that he "tried to remain objective" and did not allow Ms. Gorny's prior EEO activity to affect his deliberations, Aple. App. at 284, and Ms. Gorny has offered no evidence to suggest this statement is unworthy of credence. Further, although Ms. Gorny claims Mr. "Kesterke said that not only did he have issues with Gorny, but Bennett did as well," Opening Br. at 54, she provides no citation in the voluminous record before us to support this assertion. Under these circumstances, we have said "it is within our power as a court to refuse to consider [the] argument." *Aquila, Inc. v. C.W. Mining*, 545 F.3d 1258, 1268 (10th Cir. 2008) ("[R]eading a record should not be like a game of Where's Waldo?"); Fed. R.

(continued...)

*Second*, Ms. Gorny challenges BLM's explanations for Mr. Hall's elimination of her flexible schedule and his critiques of her work product, as well as the agency's stated reasons for her discharge and her later reinstatement in a division other than OEA. As evidence that BLM's proffered reasons for its actions are pretextual, Ms. Gorny points to the affidavit of Floyd Watson, a former EEO counselor at the Wyoming State Office. In particular, she relies on Mr. Watson's statement that he "observed that management" of the Wyoming State Office carried "vendettas against employees who would challenge managers . . . through the EEO office," and would harass those employees "either to find a way to get rid of them or to force them from their jobs." Aplt. App. at 240. From this, Ms. Gorny suggests a jury could infer that BLM management took adverse actions against her in order to "push her out" on account of her EEO activity. Opening Br. at 41.

The difficulty with Ms. Gorny's argument is that it relies only on a snippet of Mr. Watson's testimony, failing to note that Mr. Watson's observations were limited to his "time with the Wyoming State Office." Aplt. App. at 240. And, as Mr. Watson has explained, he "served as an EEO counselor for BLM employees

²(...continued)
App. P. 28(a)(9)(A) (appellant's argument must contain "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which appellant relies"). We now do just that. Finally, to the extent Ms. Gorny seeks to rely on statements by Mr. Hall to disprove BLM's reasons for her non-selection, she admits that he arrived at OEA only *after* her non-selection as chief. His statements are thus insufficient to suggest pretext.

at the Wyoming State Office from 1993 until 2004." Aplt. App. at 239. After that time, he worked as an "EEO counselor in *other* states at the request of the Washington, D.C., EEO office" and "served as an *informal* advisor to Wyoming *employees* on EEO matters." *Id.* (emphasis added). Given that Mr. Watson's observations of management vendettas were limited to "my time with the Wyoming State Office" from 1993 to 2004, they offer no help to Ms. Gorny in suggesting BLM's proffered explanations are unworthy of credence. Ms. Gorny admits that management of OEA changed in *March 2005* when Mr. Hall was selected as the new chief. And Ms. Gorny does not dispute that the elimination of her flexible schedule, the critiques of her work, her eventual discharge, and her later reinstatement all occurred *after* March 2005. In fact, almost all of the alleged adverse employment actions taken against Ms. Gorny occurred *after* 2004. So it is that Mr. Watson's observations of management behavior prior to 2005 have little, if any, relevance to the specific conduct Ms. Gorny now challenges. Indeed, Ms. Gorny's direct supervisor with whom she has the most complaints, Mr. Hall, had not even arrived at the Wyoming Office when Mr. Watson left that office. Without any meaningful connection in time to the elimination of her flexible schedule, the critiques of her work product, her discharge, and her later reinstatement, Mr. Watson's observations cannot give rise to an inference that BLM's explanations for those decisions are pretextual.

*Third*, Ms. Gorny relies on the affidavit of Ms. Colgan to attack BLM's proffered reason for her discharge. As we've already discussed, Ms. Colgan claims that, before Ms. Gorny was terminated, Mr. Hall told her that "when this is all over, Beverly Gorny is going to be gone." Aplt. App. at 231. Perhaps anticipating our earlier conclusion that this statement isn't direct evidence of retaliation, Ms. Gorny now asks us to find that the comment is at least circumstantial evidence from which an inference of retaliatory intent might be drawn. But for many of the same reasons we rejected this comment as direct evidence of retaliation, we reject it now as evidence of pretext.

As we have already explained, while Mr. Hall's alleged comment suggests that he believed Ms. Gorny would be forced to leave after her then pending EEO case concluded, it says nothing about *why* Mr. Hall believed Ms. Gorny would be forced to go. Meanwhile, a number of legally benign potential explanations exist in the record for Mr. Hall's comment, including his evident displeasure with the quality of Ms. Gorny's work product and her failure to complete projects in a timely manner. And, as we have already discussed, an employer might well — reasonably and without any unlawful animus — wish to defer a lawful termination until after the completion of an EEO complaint specifically to *avoid* even the *appearance* of unlawful retaliation. Given all this, we fail to see how Mr. Hall's comment could reasonably be viewed as evidence of pretext and a latent intent to retaliate; Ms. Gorny's contrary view rests on no more than speculation,

impermissible under our precedent. *See, e.g., Lewis v. D.R. Horton, Inc.*, 375 F. App'x 818, 828 (10th Cir. 2010) (unpublished) (holding that regular references to plaintiff as "Aunt Bea" were too "ambiguous" to create a triable question on whether the defendant's explanations were pretext for sex discrimination); *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1026 (6th Cir. 1993) (holding that a supervisor's statement that plaintiff's fifty-fifth birthday was a cause for concern "was too ambiguous to establish the necessary inference of age discrimination.").

Confirming our conclusion is the temporal remoteness between Mr. Hall's alleged comment and Ms. Gorny's termination. Ms. Gorny admits that Mr. Hall's alleged comment was made over a year before she was eventually discharged. And over the course of that year, it is apparent that Mr. Hall became increasingly dissatisfied with the quality Ms. Gorny's work product — a perfectly lawful reason for later terminating her. We have long held that comments temporally remote from a challenged firing may not suffice to establish pretext, and that is especially true where, as here, intervening events afforded the employer substantial, lawful reasons for seeking the employee's termination. *Compare Antonio v. Sygma Network*, 458 F.3d 1177, 1184 (10th Cir. 2006) (holding that a remark that plaintiff had offensive body odor because of his culture, made ten months prior to termination, was too "temporally remote" to establish pretext); *and Phelps*, 986 F.2d at 1025-26 (supervisor's age-related comments about plaintiff made "nearly a year before [her] layoff" were too remote "to have

influenced the termination decision.") *with Danville v. Regional Lab Corp.*, 292 F.3d 1246, 1251 (10th Cir. 2002) (finding evidence of pretext based on comment that plaintiff "might not be around very long anyway" made during the selection committee meeting where it was decided that plaintiff would not be interviewed for the open position).[3]

## C

In addition to her allegations of discrete retaliatory actions, Ms. Gorny claims BLM created a hostile work environment in order to retaliate against her for filing multiple EEO complaints. In both the race and gender discrimination contexts, we have said that, to survive summary judgment on a hostile work environment claim, a plaintiff must show the harassment "stemmed from racial animus" or was "because of [the plaintiff's] gender," respectively. *Chavez v. New Mexico*, 397 F.3d 826, 832, 833 (10th Cir. 2005) (emphasis omitted). A retaliatory hostile work environment claim is analytically similar: a plaintiff must demonstrate that the alleged harassment stemmed from retaliatory animus. *See Noviello v. City of Boston*, 398 F.3d 76, 93 (1st Cir. 2005) ("[O]nly those actions, directed at a complainant, that stem from a retaliatory animus . . . may be factored

---

[3] At various points in her brief, Ms. Gorny refers to other statements she claims Mr. Hall made, including alleged comments about her prior EEO activity. The problem is Ms. Gorny provides no record citations to where these comments can be found, and as we have said before, *see supra* n.2, we "need not sift through the record to find this evidence." *SIL-FLO, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1513-14 (10th Cir. 1990); *Aquila*, 545 F.3d at 1268.

into the hostile work environment calculus.").  For evidence of retaliatory animus in this case, however, Ms. Gorny relies on the same actions and comments underlying her discrete allegations of retaliation.  And, as we have already explained, none of those actions or comments establishes a triable question of retaliatory animus.  So it is that Ms. Gorny's hostile work environment claim necessarily fails for the same reasons her retaliation claims fail.

The district court's judgment is affirmed.

ENTERED FOR THE COURT


Neil M. Gorsuch
Circuit Judge