FILED
United States Court of Appeals
Tenth Circuit

February 10, 2009

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

BRANDON L. BAUM,

    Defendant - Appellant.

No. 07-6257

**ORDER**

Before **HARTZ, McWILLIAMS,** and **McCONNELL,** Circuit Judges.

    This matter is before us on the Appellant's Petition for Panel Rehearing and Rehearing En Banc. The panel GRANTS the petition for the limited purpose of revising the final paragraph of the Opinion beginning on page 15. The Opinion filed on December 22, 2008, is vacated and the attached revised Opinion is substituted in its place.

                    Entered for the Court,

                    *Elisabeth A. Shumaker*

                    ELISABETH A. SHUMAKER, Clerk

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 10, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

　　　　Plaintiff - Appellee,

v.

BRANDON L. BAUM,

　　　　Defendant - Appellant.

No. 07-6257

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. NO. 5:06-CR-00264-HE-1)**

---

Thomas D. McCormick, Oklahoma City, Oklahoma; Jill M. Wichlens, Assistant Federal Public Defender, (Raymond P. Moore, Federal Public Defender, with her on the brief), Denver, Colorado, for Appellant.

Susan Dickerson Cox, Assistant United States Attorney, (John C. Richter, United States Attorney, with her on the brief), Oklahoma City, Oklahoma, for Appellee.

---

Before **HARTZ**, **McWILLIAMS**, and **McCONNELL**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

---

　　Brandon L. Baum was convicted on six counts of wire fraud, *see* 18 U.S.C. § 1343, and seven counts of money laundering, *see id.* § 1957. These convictions arose from Mr. Baum's orchestration of a scheme to defraud mortgage lenders by

arranging for borrowers to provide false information to qualify for loans to purchase homes at artificially inflated prices. On appeal he argues (1) that the evidence at trial was insufficient to establish his fraud; and (2) that the district court miscalculated his total offense level under the United States Sentencing Guidelines (USSG) by using the amount by which the home prices were inflated as the measure of his intended loss to the lenders. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

## I. BACKGROUND

### A. The Offenses

Mr. Baum and six codefendants were charged in a 14-count indictment in the United States District Court for the Western District of Oklahoma. Thirteen counts alleged criminal conduct by Mr. Baum in representing the buyers of six homes in the Oak Tree subdivision of Edmond, Oklahoma, between 2003 and 2005.

For each of the six purchases Mr. Baum acted as the real-estate agent for the buyer, who was seeking a home loan in the subprime market because of weak credit. The buyer generally could not afford the down payment required by the lender (from 5% to 15% of the cost of the home), so the buyer borrowed that money from Mr. Baum and his associates. Mr. Baum's client agreed to buy the home at the seller's listed price, which often had been reduced over time as the home failed to sell; but Mr. Baum and his client obtained the consent of the seller

and the seller's agent to list an inflated price on the purchase contract. The price inflation did not benefit the seller because Mr. Baum prepared an addendum to the purchase contract requiring the seller to pay the excess over the listed price to a named company for remodeling or repairing the home. Apparently unbeknownst to the seller, the company was merely a bank account used to funnel the money to provide cash to the purchaser and to pay Mr. Baum and his associates for their services and for advancing the down payment.

The mortgage lender, of course, was not informed of the true nature of the transaction. The purchase-contract addendum regarding the "remodeling" or "repair" payment was not disclosed, so the lender would be led to believe that the purchase price on the contract (which apparently was supported by an appraisal) was solely for the home itself. Also, the loan application falsely represented that the buyer had not borrowed money to make the down payment, and usually contained false information regarding the purchaser's income and assets.

## B. Sentencing

Mr. Baum's base offense level under the Sentencing Guidelines was 7. *See* USSG § 2B1.1(a). The district court added 4 levels for his role as a leader of the scheme, *see id.* § 3B1.1(a), and an additional 2 levels for obstruction of justice, based on his false testimony at trial and intimidation of witnesses, *see id.* § 3C1.1. The court also added 16 levels because the loss intended by Mr. Baum was more than $1,000,000. *See id.* § 2B1.1(b)(1)(I). In computing the intended loss, the

court took into account not only the six mortgage loans underlying Mr. Baum's convictions, but also 15 uncharged loans that involved similar misconduct. *See id.* § 1B1.3(a)(2) (in setting offense level, court should consider all acts that were part of fraudulent scheme). The court then arrived at an intended loss of $1,393,243.10 by adding the amounts by which the inflated price of each home (the price stated in the purchase agreement) exceeded the actual sales price.

With a total offense level of 29 and a criminal-history category of 1, Mr. Baum's guidelines sentencing range was 87 to 108 months. *See id.* ch. 5, pt. A. The district court sentenced Mr. Baum to 87 months' imprisonment.

## II. DISCUSSION

### A. Sufficiency of the Evidence

We review the evidence de novo to determine whether a reasonable jury, viewing the evidence in the light most favorable to the prosecution, could find Mr. Baum guilty beyond a reasonable doubt. *See United States v. Gallant*, 537 F.3d 1202, 1222 (10th Cir. 2008).

"To convict a defendant of wire fraud under 18 U.S.C. § 1343, the government must show (1) a scheme or artifice to defraud or obtain property by means of false or fraudulent pretenses, representations, or promises, (2) an intent to defraud, and (3) . . . use of interstate wire . . . communications to execute the scheme." *Id.* at 1228 (internal quotation marks omitted). The wire transfer for

each wire-fraud count was the transfer of money from the mortgage lender to the title company handling the closing.

To prove money laundering under 18 U.S.C. § 1957, "[t]he government must prove five elements:  that the defendant (1) engaged or attempted to engage, (2) in a monetary transaction, (3) in criminally derived property, (4) knowing that the property is derived from unlawful activity, and (5) that the property is, in fact, derived from specified unlawful activity."  *United States v. Lake*, 472 F.3d 1247, 1260 (10th Cir. 2007) (internal quotation marks omitted).  *Specified unlawful activity* is defined to include wire fraud.  *See id.* (noting that "[s]pecified unlawful activity" is "any of a number of offenses listed in 18 U.S.C. § 1956(c)(7), . . . includ[ing] wire fraud" (internal quotation marks omitted)).  And *criminally derived property* includes property (such as money) acquired through wire fraud.  *See id.*  The "monetary transactions" in this case were the transfers of loan proceeds from the make-believe contractors to Mr. Baum and others.

Mr. Baum's sole challenge to his money-laundering convictions is that the government did not prove wire fraud, so there was no unlawful or criminally derived property.  Because this challenge therefore depends on the merits of his challenge to the wire-fraud convictions, it need not be discussed separately.

Mr. Baum challenges his wire-fraud convictions on the grounds that (1) all the financial arrangements in the six transactions were fully disclosed; (2) the inflated home values were based on subjective appraisals and therefore cannot

form the basis of a wire-fraud conviction; and (3) the failure to have remodeling or repair work done on the homes, despite the requirements of the purchase-contract addenda, amounts merely to a breach of contract, not a crime.

We question whether we have a duty to consider Mr. Baum's challenge to the sufficiency of the evidence of guilt. Although the trial transcript fills 11 volumes, his opening brief, which is the only one of his briefs on appeal to raise the issue, devotes only five pages to a statement of the case, statement of the facts, summary of the argument, and argument. The argument contains no reference to the trial record, and, aside from his citation to his own testimony, the only reference to the record in the statement of facts is a string cite to 15 excerpts, consisting almost entirely of his cross-examination of various government witnesses, without any description of what was elicited in each excerpt. No attempt was made to explain why the incriminating evidence (which one would expect to find in the direct testimony of the government witnesses) would not suffice to establish guilt. Such a presentation requires the court "to scan volumes aimlessly" in a search for what was established at trial. *Aquila, Inc. v. C.W. Mining*, 545 F.3d 1258, 1268 (10th Cir. 2008). It may well be "within our power as a court to refuse to consider an argument in these circumstances." *Id.*

In any event, Mr. Baum's arguments fail on their merits. With respect to his first two contentions, there was extensive evidence that the mortgage lenders were not fully informed about the financial transactions regarding the home

-6-

purchases. And even if the appraisals were totally legitimate, the phony sales prices, undisclosed addenda, and false information about the borrowers' finances would easily support the verdicts.

Finally, Mr. Baum's third argument—that failure to have the remodeling or repair work done was simply a breach of contract, not a crime—misses the point. Mr. Baum's guilt did not turn on whether such work occurred. The fraud (or at least the aspect of the fraud to which the addenda were relevant) was that the mortgage lender was led to believe that it was lending money to purchase a home for $X, not to purchase a home for $X-Y and then undertake $Y worth of remodeling or repairs. As an officer of one lender testified, she would question the accuracy of an appraisal if it exceeded the actual sales price. And representatives of each lender testified that the loans would not have been approved had they known of the addenda.

Accordingly, we hold that the evidence at trial was sufficient to establish Mr. Baum's fraud, and therefore we reject his challenges to his fraud and money-laundering convictions.

### B. Sentencing

Under the Sentencing Guideline for various property offenses, including theft, embezzlement, and fraud, the offense level is increased based on the loss. *See* USSG § 2B1.1(b). In general, "loss is the greater of actual loss or intended loss." *Id.* § 2B1.1 cmt. n.3(A). The probation office's presentence report (PSR)

calculated what it termed the "Intended loss/Actual loss" in this case as $1,393,243.10. R. Vol. 14 at 24. Because this loss was between $1,000,000 and $2,500,000, the offense level increased by 16. *See* USSG § 2B1.1(b)(1)(I). To reach the total of approximately $1.4 million, the PSR considered the six loan transactions for which Mr. Baum was convicted and an additional 15 loan transactions which it considered to be part of his overall scheme. *See id.* § 1B1.3(a)(2) (specific offense characteristics—such as total loss from fraud—are determined based on all conduct that was part of same scheme). (Mr. Baum has not challenged the district court's consideration of all 21 transactions.) For each loan the price of the home shown on the purchase agreement was inflated above the actual agreed-upon sale price by what we will call "the Excess Amount"; the purchase agreements included addenda (not disclosed to the lenders) requiring that the Excess Amount be paid to a company ostensibly for remodeling or repairing the home, rather than to the seller. The total of the 21 Excess Amounts was about $1.4 million.

Mr. Baum objected to the PSR on the ground that no "loss, intended or actual, occurred in this case." R. Vol. 14 at 39. At the sentencing hearing, his sole explanation for this assertion was that the PSR had not considered "the resale value of the homes themselves." *Id.* Vol. 2 at 3. The district court overruled the objection and ruled that the intended loss was the amount set forth in the PSR.

On appeal Mr. Baum's contentions are more specific.  He now argues that he intended no loss and that the actual loss to the mortgage lenders—which arose when the borrower defaulted and the foreclosure sale netted less than the amount owed on the mortgage loan—was a little more than $500,000, which would call for an offense-level increase of 14, rather than 16.  *See* USSG § 2B1.1(b)(1)(H). To support his claim that he intended no loss, he observes that his gains from the loan scheme depended on merely getting the loans, not having purchasers default on them.  If anything, he argues, his interest was in having the purchasers not default, because then his scheme could remain undetected for longer.

The merit of Mr. Baum's argument turns on what it means to *intend* a loss. The Sentencing Guidelines define *intended loss* as "(I) . . . the pecuniary harm that was intended to result from the offense; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (*e.g.*, as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value.)"  USSG § 2B1.1 cmt. n.3(A)(ii).  This definition, however, assumes that we already know what the word *intended* means.

Mr. Baum assumes that intent must include an element of purpose or desire. If he were correct, then he would have a good argument that he intended no loss, because the evidence does not suggest that he desired anyone to lose money or even that his purpose was that the lenders lose money.  But he is not correct.  As the Supreme Court informed us in *United States v. United States Gypsum Co.*, 438

U.S. 422, 445 (1978), "The element of intent in the criminal law has traditionally been viewed as a bifurcated concept embracing either the specific requirement of purpose or the more general one of knowledge or awareness." In other words, a defendant may be said to have intended a loss if he had the requisite knowledge or awareness, even if he had no desire for the loss.

The quality of the knowledge required, however, may be debated. As we shall see, there is some authority that a defendant is said to intend a consequence if he knows that the consequence is *probable*. Other authority, in contrast, suggests that intent requires knowledge that the consequence is *practically certain*. This difference could be decisive for Mr. Baum. One could reasonably contend that the evidence does not support a finding that a loss exceeding $1 million was practically certain. If, however, knowledge of *probable* consequences suffices to establish intent, then the district court was on firm ground in finding that Mr. Baum's intended loss exceeded $1 million. Because the trial evidence indicated that Mr. Baum's clients, the home purchasers, were seeking subprime loans, and often needed to falsify financial information and borrow the down payment even to qualify for such loans, the prospects for loan default were considerable. In that event the lender's losses would depend on what could be obtained by foreclosing on the homes. Although the loss on each foreclosure would not necessarily equal the Excess Amount, that figure would be a reasonable measure of the probable loss. *See* USSG § 2B1.1 n.3(C) ("The court

-10-

need only make a reasonable estimate of the loss.")  To begin with, the home's market value was unlikely to exceed the true sales price, particularly because that price had often been set after attempts to sell at a higher price had failed.  So the inflated value—the true sales price plus the Excess Amount—was likely to exceed the market price by at least the Excess Amount.  When one then considers (1) that a forced sale, such as a foreclosure sale, generally does not recover even the market value, and (2) that the costs of foreclosure can be considerable, one could conclude that the lender would ordinarily be fortunate if its loss in the transaction (after lending 85% to 95% of the inflated price) were only the Excess Amount.  True, there may be variation from home to home; but the average loss on the 21 homes could be expected to be at least the Excess Amount, making a total loss of $1.4 million to be a conservative figure, and rendering eminently reasonable the application of USSG § 2B1.1(b)(1)(I), which requires only an intended loss above $1 million.

Thus, we examine what quality of knowledge is required for intent.  Some authority suggests that it is enough that the defendant know that the loss is probable.  In the antitrust case before it, the *United States Gypsum* Court "conclude[d] that action undertaken with knowledge of its probable consequences and having the requisite anticompetitive effects can be a sufficient predicate for a finding of criminal liability under the antitrust laws."  438 U.S. at 444.  More directly in point, the First Circuit, when interpreting USSG § 2B1.1 in a context

very similar to the one before us (fraudulently obtained loans for homes with inflated purchase prices), equated "intended loss" with "expected" loss. *United States v. McCoy*, 508 F.3d 74, 79 (1st Cir. 2007) ("The guideline makes clear that intended loss—'expected' would be a better term—is to be used where it is higher than actual loss, that expectation being a measure for the defendant's culpability.")

We note that there are also dicta in this circuit suggesting that intent requires only knowledge that a consequence is probable. Twice we have said, "To prove intended loss, the government must show that the defendant realistically intended a particular loss, or that a loss in that amount was probable." *United States v. Swanson*, 360 F.3d 1155, 1168 (10th Cir. 2004) (internal quotation marks omitted); *United States v. Schild*, 269 F.3d 1198, 1200 (10th Cir. 2001) (internal quotation marks omitted). But in both cases there was clear evidence that "the defendant realistically intended" the loss, and the issue of interest in this case—whether the defendant must know that the loss is practically certain rather than merely probable—was not presented to the court. More importantly, the dicta are based on precedent that is now of questionable authority. The above-quoted language traces back to our statement in *United States v. Smith*, 951 F.2d 1164, 1168 (10th Cir. 1991), that "[t]o meet the requirements of the Guideline . . . the record must support by a preponderance of the evidence the conclusion that [the defendant] realistically intended a $440,896

-12-

loss, or that a loss in that amount was probable." The word *probable* was taken from application note 7 to USSG § 2F1.1 (an earlier guideline addressing intended loss in fraud cases, later consolidated into the guideline we are considering, USSG § 2B1.1), which said: "In keeping with the Commission's policy on attempts, if a probable or intended loss that the defendant was attempting to inflict can be determined, that figure would be used if it was larger than the actual loss" (quoted in *Smith*, 951 F.2d at 1166). But effective November 1, 1991, the word *probable* was deleted from the application note. *See* USSG app. C, amend. 393. (On the other hand, we may have suggested that knowledge of probable consequences suffices for intent when we have repeatedly said that a jury can infer that the defendant intended the natural and probable consequences of his acts. *See, e.g.*, *United States v. Pettigrew*, 468 F.3d 626, 639 (10th Cir. 2006).)

Opposed to the above authority is substantial authority that mere knowledge of a *probable* result does not suffice for intent. The Supreme Court in *United States Gypsum*, although apparently concluding that "knowledge of . . . probable consequences," 438 U.S. at 444, satisfied the intent requirement in that case, proceeded to quote a leading treatise for the proposition that "a person . . . intends a result of his act . . . when he knows that the result is *practically certain* to follow from his conduct, whatever his desire may be as to that result." *Id.* at 445 (quoting W. LaFave & A. Scott, Criminal Law 196 (1972) (emphasis added));

*see* Wayne R. LaFave, 1 Substantive Criminal Law § 5.2(a), at 341 (2d ed. 2003). Intent instructions using the "practically certain" language certainly appear in this circuit. *See, e.g.*, *United States v. Platte*, 401 F.3d 1176, 1181 (10th Cir. 2005). And the guidelines definition of *actual* loss as "the reasonably foreseeable pecuniary harm that resulted from the offense," USSG § 2B1.1 cmt. n.3(A)(i), might suggest that reasonable foreseeability could not also be the test for *intended* loss. (We observe, however, that in the context of the quoted comment, "reasonably foreseeable" is not meant to expand what is included in "actual loss," but is clearly meant to exclude losses that could not have been so foreseen, even if caused by the defendant's conduct. *See* USSG supp. to app. C, amend. 617 at 182.)

Thus, it is an unsettled question whether intended loss requires knowledge that the loss is a virtual certainty or only knowledge that the loss is probable. The answer to the question could be dispositive in this case because one could reasonably contend that the evidence does not support a finding that a loss exceeding $1 million was a virtual certainty. But we need not provide an answer here. This point was not raised before the district court. Mr. Baum did not even address the possibility that intended loss could be established by a showing of knowledge or awareness of, as opposed to desire for, future loss. He certainly did not raise below the only argument on which he might prevail on appeal—that intended loss requires knowledge that the loss is virtually certain to occur rather

-14-

than that it is merely a probable consequence. Consequently, the district court had no reason to address what definition of *intended loss* it was using and had no opportunity to consider, and perhaps apply, a different standard.

In this circumstance we should not reverse the district court's intended-loss finding unless the court's possible error in applying USSG §2B1.1 satisfies the requirements of plain-error review. *See United States v. Hasan*, 526 F.3d 653, 660–61 (10th Cir. 2008) ("[W]hen a party fails to preserve an issue before the district court, our review is . . . limited to ascertaining whether the error . . . qualifies as plain error."). The error alleged here does not satisfy those requirements. One requirement for relief under plain-error review is, not surprisingly, that the error be "plain." *See United States v. Smith*, 413 F.3d 1253, 1274 (10th Cir. 2005) (setting forth the elements of plain-error review). An error in a ruling is "plain" only if the ruling violates "well-settled law." *Id.* (internal quotation marks omitted). When no authority from the Supreme Court or this circuit would compel a determination that there was error and there is contrary authority in other circuits, the error can rarely be plain. *See id.* We have recognized plain error despite contrary authority in other circuits only in the context of an unambiguous statutory command. *See United States v. Ahidley*, 486 F.3d 1184, 1193 & n.7 (10th Cir. 2007); *United States v. Overholt*, 307 F.3d 1231, 1256 (10th Cir. 2002) ("Although it may appear obtuse to hold that it is plain error to delegate the task of setting a payment schedule when there is

-15-

contrary authority in other circuits, in each of those decisions either the opinion predated the AEDPA amendments to § 3664 or the present provisions of § 3664 were not brought to the attention of the court.")  Here, however, the guidelines do not define intent, opinions by the Supreme Court and this court provide substantial support for a view contrary to Mr. Baum's, and the sole appellate decision in point is that of the First Circuit, which said that a loss is intended if it is expected.  *See McCoy*, 508 F.3d at 79.  Accordingly, *Ahidley* and *Overholt* are inapposite; we must reject Mr. Baum's challenge to his sentence.

## III.  CONCLUSION

We AFFIRM Mr. Baum's convictions and sentence.