**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

JASONN GONZALES,

     Defendant - Appellant.

No. 16-2022

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:14-CR-00922-JB-1)**
_____

Brian A. Pori, Federal Public Defender, Albuquerque, New Mexico, for Defendant-Appellant.

James R.W. Braun, Assistant United States Attorney, (Damon P. Martinez, United States Attorney, with him on the brief ), Albuquerque, New Mexico, for Plaintiff-Appellee.
_____

Before **HARTZ**, **MURPHY**, and **HOLMES**, Circuit Judges.
_____

**HARTZ**, Circuit Judge.
_____

Defendant Jasonn Gonzales pleaded guilty in the United States District Court for the District of New Mexico to four counts of mail fraud, *see* 18 U.S.C. § 1341, one count of conspiracy to commit mail fraud, *see* 18 U.S.C. §§ 1341 and 1349, and one count of aggravated identity theft, *see* 18 U.S.C. § 1028A, arising out of his fraudulent scheme to

obtain unemployment benefits from three state agencies. On appeal his sole argument is that the district court erred in calculating his sentencing-guidelines offense level by including as victims those persons whose identities had been stolen even though they suffered no financial loss. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.     BACKGROUND

From January 2009 through May 2012, Defendant and Gerald Archuleta tricked unemployment agencies in Texas, Colorado, and New Mexico into sending them prepaid debit cards for unemployment benefits for unqualified people. They registered fake companies with the agencies and paid unemployment taxes for them, listing real people (with correct social security numbers and other personal information[1]) as employees of the companies. They then submitted unemployment-benefit claims on behalf of those people. The unemployment agencies mailed the debit cards to post office boxes rented by the two men, who used the cards for their personal benefit.

Law-enforcement officers searched Defendant's home on May 22, 2012, and found substantial evidence of the scheme. For reasons not apparent in the record on appeal, Defendant was not indicted until almost two years later, on March 26, 2014. He pleaded guilty on August 18, 2014, to all charges without the benefit of a plea agreement.

When calculating Defendant's offense level for the mail-fraud and conspiracy charges, the probation office's presentence report (PSR) started with a base level of 7.

---

[1] Apparently, Defendant obtained at least some of the information from people he assisted with tax returns and from personnel files of employees at businesses where he worked as an accountant.

*See* USSG § 2B1.1(a)(1) (2014) (guideline for theft offenses).[2]  It raised the level because of three special offense characteristics, adding 16 levels for an intended loss over $1 million, *see id.* § 2B1.1(b)(1)(I), two levels for Defendant's use of sophisticated means, *see id.* § 2B1.1(b)(10)(C), and four levels because the number of victims exceeded 50, *see id.* § 2B1.1(b)(2)(B).  The PSR then added four levels because Defendant was an organizer or leader, *see id.* § 3B1.1(a), and subtracted three levels for acceptance of responsibility, resulting in an offense level of 30.  With Defendant's criminal-history category of II, his guidelines sentencing range was 108 to 135 months' imprisonment. For Defendant's aggravated-identity-theft conviction, the PSR added the mandatory consecutive two-year prison term.  *See* 18 U.S.C. § 1028A; *see also* USSG § 2B1.6 (guideline for aggravated identity theft).

Defendant objected to the number-of-victims enhancement on the ground that the only financial losses from the scheme were suffered by the three state agencies.  The PSR counted 107 victims, however, because application note 4(E)(ii) to USSG § 2B1.1 defines *victim* to include "any individual whose means of identification was used unlawfully or without authority."  Defendant argued that the application note could not be used in calculating his sentence because he was also being sentenced for aggravated identity theft under 18 U.S.C. § 1028A, and for someone so sentenced application note 2 to USSG § 2B1.6 prohibits applying any enhancement "for the transfer, possession, or use of a means of identification."  At sentencing on December 4, 2014, the district court

---

[2]  Throughout the opinion we refer to the November 1, 2014 version of the guidelines, which was the version used for Mr. Gonzales's sentencing.  The parties do not dispute that this was the correct version to apply.

overruled the objection, adopted the PSR's guidelines calculation, and varied downward for an ultimate sentence of 111 months' imprisonment.

## II. DISCUSSION

Several guidelines provisions are central to our discussion. Section 2B1.1(b)(2) states: "If the offense . . . involved 50 or more victims, increase [the offense level] by 4 levels." USSG § 2B1.1(b)(2). Application note 4(E) to that section defines *victim* where, as here, the case "involve[s] means of identification." The note incorporates the general definition in application note 1[3] but also includes within the definition of *victim* "(ii) any individual whose means of identification was used unlawfully or without authority."[4] These are the provisions used by the district court.

Defendant's arguments rest on an application note to the guidelines provision concerning his conviction for aggravated identity theft under 18 U.S.C. § 1028A. The guideline states: "If the defendant was convicted of violating 18 U.S.C. § 1028A, the guideline sentence is the term of imprisonment required by statute [two years]." *Id.* § 2B1.6; *see* 18 U.S.C. § 1028A. Application note 2 to that section provides:

> If a sentence under this guideline is imposed in conjunction with a sentence for any underlying offense, *do not apply any specific offense characteristic for the transfer, possession, or use of a means of identification* when determining the sentence for the underlying offense. A sentence under this

---

[3] Application note 1 to § 2B1.1 defines *victim* as "(A) any person who sustained any part of the actual loss determined under subsection (b)(1) [which refers to monetary harm]; or (B) any individual who sustained bodily injury as a result of the offense." *Id.* § 2B1.1 cmt. n.1.

[4] Application note 4(E) states in full: "Cases Involving Means of Identification.—For purposes of subsection (b)(2), in a case involving means of identification 'victim' means (i) any victim as defined in Application Note 1; or (ii) any individual whose means of identification was used unlawfully or without authority."

> guideline accounts for this factor for the underlying offense of conviction, including any such enhancement that would apply based on conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct).

USSG § 2B1.6, cmt. n.2.  (emphasis added)

Defendant contends that this provision forbids use of application note 4(E) to enhance his sentence.  He argues that there were only three victims of his scheme—the three state unemployment agencies—because they are the only ones who suffered monetary loss.  The other "victims" counted by the PSR were counted only because they were "individual[s] whose means of identification was used unlawfully or without authority."  USSG § 2B1.1 cmt. n.4(E).  But, the argument continues, counting them would be a prohibited application of a "special offense characteristic for the transfer, possession, or use of means of identification."  Therefore, he says, the four-level 50-victim enhancement was improper.

Defendant focuses on the guidelines' use of the word *any* in application note 2, arguing that the word requires a broad reading, "proscrib[ing] application of all [special offense characteristics] of whatever kind 'for the use of a means of identification.'"  Aplt. Op. Br. at 19.  Noting that the express purpose of note 2 is to prevent double-punishing a defendant who improperly uses another person's identifying information, he suggests that his conduct was double-punished because he received both the two-year consecutive term under § 1028A and the victim enhancement for the same conduct.  He contends that the application note is unambiguous, but that even if it were unclear, the rule of lenity directs us to interpret it in his—the defendant's—favor.

This argument, however, appears to be foreclosed by circuit precedent. In *United States v. Manatau*, 647 F.3d 1048, 1048–49 (10th Cir. 2011), the defendant pleaded guilty to bank fraud and aggravated identity theft arising from his stealing and using social security numbers, credit cards, and checks. In calculating the defendant's offense level, the court counted the number of victims based on application note 4(C) to § 2B1.1 (2009), which at that time defined *victim* "[i]n a case in which undelivered United States mail was taken." The definition included "any person who was the intended recipient, or addressee, of the undelivered United States mail." USSG § 2B1.1 cmt. n.4(C) (2009). Almost none of these "victims" sustained actual monetary harm.

Mr. Manatau contended on appeal that it was error to apply this enhancement, raising the same argument advanced by Defendant here—that the enhancement was forbidden by § 2B1.6 application note 2 because of his conviction under 18 U.S.C. § 1028A. We agreed with him that "the guidelines tell courts not to apply an enhancement based on a 'specific offense characteristic for the transfer, possession, or use of a means of identification,' where . . . a defendant has been convicted of aggravated identity theft and bank fraud." *Manatau*, 647 F.3d at 1057 n.4 (quoting USSG § 2B1.6 app. n.2). But we held that "the number of victims is not such an offense characteristic." *Id.*

Defendant argues that *Manatau* is not controlling because "[n]owhere in the . . . opinion or in the briefs in that case is there any mention of § 2B1.1's application note 4(E)(ii)." Aplt. Op. Br. at 21–22. He adds that "[i]t is not even apparent the district court in that case applied that note since the defendant's offenses occurred before the note

6

went into effect on November 1, 2009." *Id.* at 22. Therefore, he says, this court has not yet addressed the implications of note 4(E)(ii).

Defendant is correct that note 4(E)(ii) was not in effect when Mr. Manatau was sentenced. But our broad language in *Manatau* did not restrict itself to any particular definition of *victim* in the number-of-victims enhancement. We said without qualification that "the number of victims" is not an offense characteristic encompassed by application note 2 to § 2B1.6.

Even if *Manatau* is not strictly controlling, we agree with it and apply it here. Defendant conflates the nature of the crime and the extent of the crime. Application note 2 states that a guidelines enhancement based on the nature of the crime—"the transfer, possession, or use of a means of identification"—cannot be applied to a defendant who is also being sentenced under 18 U.S.C. § 1028A. But it does not restrict an enhancement based on the *extent* of such a crime. In that circumstance there is no double counting. In particular, using the definition of *victim* applied in this case does not lead to any double counting. The aggravated-identity-theft statute, 18 U.S.C. § 1028A, imposes a mandatory two-year consecutive sentence if a person "during and in relation to any felony violation enumerated in [the statute], knowingly transfers, possesses, or uses without lawful authority, a means of identification of another person." The two-year mandatory sentence does not depend on the number of persons whose identities have been stolen. (Of course, a defendant may be convicted on multiple counts charging violations of § 1028A, but the sentences on those counts may run concurrently. *See id.* § 1028A(b)(4); USSG § 2B1.6, cmt. n.1(B).) Thus, the sentence imposed for aggravated

7

identity theft does not necessarily reflect the number of victims. For example, Defendant's sentence on the charge was going to be two years' imprisonment no matter how many identities he stole. Yet it is reasonable to treat criminal conduct more seriously as the number of stolen identities increases, and application note 4(E)(ii) to USSG § 2B1.1 accomplishes that. Certainly it was advantageous to Defendant that his multiple identity thefts were taken into account under the application note rather than his being charged with more than 100 counts of aggravated identity theft.

A proper occasion for using application note 2 to § 2B1.6 would be when the sentencing court would otherwise apply USSG § 2B1.1(b)(11)(C), which increases the offense level if an offense involved "the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification." *See United States v. Anderson*, 532 Fed. App'x 373, 378 (4th Cir. 2013) (offering this provision as an example of an enhancement prohibited by § 2B1.6, app. n.2); *United States v. Lyles*, 506 F. App'x 440, 447 (6th Cir. 2012) (same). We are not aware of any other guideline that would come under application note 2; but the Sentencing Commission may well have decided to speak in general language that could cover future guidelines amendments.

Finally, we note that our fellow circuits agree with our reading of the guidelines. Every circuit to have ruled on this issue has allowed the enhancement. *See United States v. Ford*, 784 F.3d 1386, 1397–98 (11th Cir. 2015); *Anderson*, 532 F. App'x 373; *Lyles*, 506 F. App'x 440; *United States v. Yummi*, 408 F. App'x 537, 541 (3d Cir. 2010). We join this consensus.

**III.    CONCLUSION**

We **AFFIRM** the district court's judgment and sentence.